LIZZIE VANTINE v. MARY BUTLER et al.,
Appellants.

**Division One, February 29, 1912.**

1. **EVIDENCE: Pedigree: Declaration of Deceased Person.**   A reasonable weight of preliminary proof of relationship between declarant, the decedent and the pretermitted claimant who claims to be the child of the decedent should be required before the declarations of a deceased declarant are received in evidence. But the degree of such proof must of necessity depend upon the facts and circumstances of each particular case, and no hard-and-fast rule can be enforced unbendingly in all cases.

2. ———: ———: ———: **Preliminary Proof.**   The plaintiff sues as a pretermitted heir of John Butler, who died testate in 1906, and who drove his wife away from home about 1859, only a few days before she gave birth to a child, and plaintiff claims to be that child.   Shortly after the separation Butler sent the three older children to New York, and joined the Union army and did not return to the community until 1865. During the first two or three years of his absence, the wife and the baby girl lived with neighbors in the neighborhood of her old home, but were a part of the time in the poorhouse, and in 1863 went to the county seat of the adjoining county, and were never again seen in the neighborhood.   The wife's name was Jane, she was about thirty years of age at the time Butler drove her away, having rather fair complexion, dark brown hair, blue eyes, dark eyelashes, medium height, and inclined to be fleshy, and prior to the separation one of her arms

had been seriously burned and permanently disfigured. In the month of October, 1863, a woman about thirty-five years of age came from the direction of the county seat, to which Jane Butler had gone, to a camp of Union soldiers, bringing with her a child about four years old, remained in the camp over night, and the child was sent, by the hack driver, to another county seat, and there left at the home of one Wetmore, and was seen there by soldiers in the month of November. After living with Wetmore and his wife six or seven months, she was adopted by them and lived with them until she married. Shortly after the child was turned over to them, the same woman who had come with her to the army camp appeared in the neighborhood of the Wetmores, and was known there as Jane Butler for a year or more. She had a burnt arm, blue eyes, dark eyebrows and dark hair, and was of rather dark complexion, medium height and "chubby." She was nervous, excitable, sad and somber, and of a roving disposition, all of which characterized Jane Butler. Jane Butler was a Catholic and sympathized with the Union cause; this woman was a Catholic and sympathized with the Union cause, and objected to Mrs. Wetmore rearing the child because she was not a Catholic and did not sympathize with the Union cause, and called upon the Union soldiers for assistance in procuring custody of the child, but the trouble, which at first assumed an ugly aspect, was compromised, and Mrs. Wetmore gave her a photograph of the child, and she went away and was never afterwards heard of, except, in a general way, it was heard that she had died. John Butler, after his return to his farm in 1865, frequently spoke of the child and expressed to the neighbors a desire to locate her, and never questioned her legitimacy, but as a rule was silent and reticent about his wife and the child. He married again, had several children, and by his will gave his property to his last wife and her children. *Held*, that there was abundant preliminary proof of the relationship to authorize the admission in evidence of the declaration of the woman who appeared at the Wetmores, that she was the wife of John Butler, that her name was Jane Butler, that the child was hers, that the child's name was Lizzie, that she had first named her Caledonia but after leaving the old neighborhood had changed her name to Lizzie, that John Butler was the father of the child, and that she had given birth to his three older children, one of whom was named Annie Butler.

Appeal from Boone Circuit Court.—*Hon. Nick M. Bradley*, Special Judge.

Affirmed.

*Whitecotton & Wight* for appellants.

(1) The court committed error in admitting the testimony of Mrs. Mills as to the identity of Jane Butler by Jane Butler's own declarations with no other proof, and also as to her relation to John Butler for the same reason. The same is true as to the testimony of Robert Farthing. 1 Wharton on Evidence, p. 209; Greenleaf on Evidence (15 Ed.) sec. 207; 18 Am. & Eng. Ency. Law, 257, 263; 22 Am. & Eng. Ency. Law (2 Ed.), 257, 263; Elliott on Evidence, sec. 380, 381; Wigmore on Evidence, sec. 1490; 16 Cyc. 1229; Kennedy's Trial Evidence, p. 22; 2 Jones on Evidence, p. 712. (2) There being no competent proof whatever as to the identity of the plaintiff or that she was an heir of John Butler, the court clearly erred in its finding, judgment and decree. Schmuding v. Ewing, 57 Mo. 79; Klostermon v. Koge, 39 Mo. App. 60; Shumate v. Snyder, 140 Mo. 77.

*Gillespy & Conley* for respondents.

(1) The modern rule and the rule of the best considered cases and text-writers as to the qualification of the declarant is that he must be related to the person by blood or marriage, as to whose pedigree his declarations are offered; that he may be related to the plaintiff, in which case his declaration tends to prove the pedigree of the plaintiff, or to the deceased in which case his declarations tend to prove the pedigree of the deceased. Wigmore on Evidence, sec. 1491; In re Hartman's Estate, 107 Pac. (Cal.), 105; In re Clark's Estate, 110 Pac. (Cal.), 828; Overby v. Johnston, 94 S. W. (Tex.), 131; Fowler v. Simpson, 79 Tex. 614; Sitler v. Gehr, 105 Pa. 577; Smith v. Smith, 140 Wis. 599; Mann v. Kavanaugh, 110 Ky. 776. (2) Only slight evidence is necessary to prove the relationship. Fulkerson v. Holmes, 117 U. S. 397; Vowles v. Young, 13 Ves. Jr. 147; Monkton v. Atty-Gen., 12 R. & M. 157; Young

v. Shullenberg, 165 N. Y. 385; In re Robb, 37 S. C. 19; Brown v. Lazarus, 5 Tex. Civ. App. 81; Fowler v. Simpson, 79 Tex. 614; Louder v. Schluter, 78 Tex. 105; 22 Am. & Eng. Ency. Law (2. Ed.), 644, and cases cited; Layton v. Kraft, 98 N. Y. Supp. 72. (3) The conduct, representations and declarations of a person whose identity is in question are competent if made *ante litem motam.* The declarations of a person under such circumstances as to his name, past history and family connections are not hearsay, but are admissible for the purpose of determining his identity. 3 Wigmore on Evidence, secs. 270, 1791, 1494; 6 Ency. Evidence, 922, and cases cited; Howard v. Russell, 75 Tex. 171; McNeil v. O'Connor, 79 Tex. 227; Nehring v. McMurrain, 94 Tex. 45; 15 Am. & Eng. Ency. Law (2 Ed.), 918; Mullery v. Hamilton, 71 Ga. 720; La Riviere v. La Riviere, 77 Mo. 512; Long v. McDow, 87 Mo. 197; State v. Elwood, 17 R. I. 763. (4) Whether the Jane Butler and Lizzie Butler of Paris were the same persons as the Jane and Lizzie Butler of Boone county was purely a queston of establishing an identity. La Riviere v. La Riviere, 77 Mo. 512. And the declarations of Mrs. Butler were competent as evidence of her identity whether she is living or dead. Nehring v. McMurrain, 94 Tex. 45. (5) The statements made by Mrs. Butler as to her name and the name by which she was known in Paris and the statements of witnesses that the child in Paris was called Lizzie Butler is not hearsay, but primary evidence. It is relied on as a source of knowledge. Willis v. Quimby, 31 N. H. 487; Harris v. Martin, 150 N. C. 367; Gillian v. State, 3 Tex. App. 134; Berniaud v. Bucher, 11 Pac. 802; 1 Wigmore, sec. 667. (6) "A name is a word by which a person or thing is denoted; the word or words by which an individual person or thing or class of persons or things is designated and distinguished from others." Century Dictionary, "Name;" Roth v. Pallachullo Club, 61 S. E. (S. C.) 78; People v. Free-

man, 8 Cow. (N. Y.) 106; Rich v. Mayer, 7 N. Y. Supp. 70; People v. Leong Quong, 60 Cal. 107. The designation by which one is distinctively known in the community. Laflin v. Steytler, 146 Pa. St. 434. The name is the very means by which persons in conversation are identified. (6) Identity of name is prima facie evidence of identity of persons. La Riviere v. La Riviere, 77 Mo. 514; Long v. McDow, 87 Mo. 202; State v. Moore, 61 Mo. 279; Gitt v. Watson, 18 Mo. 277; Hoyt v. Davis, 21 Mo. App. 239; Meyer v. Bank, 27 Ind. App. 354; People v. Seaman, 239 Ill. 611. (7) The declarations are admissible to prove not only matters of pedigree proper, such as relationship and descent, but also collateral matters tending to prove the same and births, deaths and marriages. 22 Am. & Eng. Ency. Law (2 Ed.), 640; In re Imboden's Estate, 111 Mo. App. 235; Topper v. Perry, 197 Mo. 531; Beckman v. Nacke, 56 Mo. 546.

WOODSON, J.—Counsel for appellants make the following brief and clear statement of the issues, which I adopt as a partial statement of the case, viz.:

"This cause is in this court by appeal on the part of the defendants, Mary Butler, Louititia Phelan and Mary Butler, the younger, and Vincent D. Phelan, executors of the last will and testament of John Butler, deceased, defendants in the above entitled cause, from a decree and judgment of the circuit court of Boone county, Missouri, in favor of the plaintiff establishing her right as a pretermitted heir.

"The petition is in ordinary form and alleges that John Butler died testate on October ——, 1906, as to all his heirs except this plaintiff, and that by his last will and testament he devised to his present widow, Mary Butler, all his real estate to hold during her natural life, and after her death disposed of it in fee to his children and grandchildren as provided in said will, not mentioning the plaintiff in his will in any

way; that said John Butler possessed at the time of
his death about two thousand acres of land and per-
sonal property of about ten thousand dollars; that
plaintiff is an heir at law in said estates and entitled
to a one-sixth undivided interest therein, both in the
realty and the personalty thereof, after the marital
rights of the widow have been assigned and set off to
her; that said will of said John Butler, deceased, has
been duly probated and that by the terms of said will
Mary Butler and Vincent D. Phelan are named as
executors and have duly qualified as such and taken
possession of both the personal and real estate of the
said deceased. Wherefore plaintiff prays that issues
be framed to determine the facts aforesaid, and that
she be adjudged a daughter and a lawful heir of said
John Butler, and entitled to a one-sixth interest in his
estate, both real and personal, and a tenant in common
with the defendants in all of said real estate and that
an accounting be had between her and said executors,
heirs and devisees, and for all such other and further
relief as to the court may seem just in the premises.

"The petition in this case was filed on the 11th day
of January, 1908. On June the first, 1908, these de-
fendants filed an answer denying each and every alle-
gation in said petition.

"The record discloses that the question of the
heirship of the plaintiff was the only vital issue in con-
troversy between the parties to this proceeding."

The evidence in the case is quite voluminous, some
sixty witnesses testified in the case on behalf of the
plaintiff, none for defendants, and their testimony
covers over two hundred pages of closely printed mat-
ter. For that reason, it will be impractical to set out
even a summary of the testimony of each. We will,
however, state generally what the evidence tended to
show, which is as follows:

John Butler, the alleged father of the plaintiff,
died testate in Boone county, in the fall of 1906, own-

ing about 1800 acres of land, described in the plead-ings, and about $15,000 worth of personal property. The will was duly probated, and he devised the lands to his widow, Mary Butler, for life, with the re-mainder in specific portions to the other defendants.

John Butler and his first wife, Jane Butler, who it is claimed was the mother of the plaintiff, were Irish Catholics, who came from New York to this State about the year 1857. They then had two children, Harry and William.

Butler was a carpenter and lived at or near Sturgeon, in Boone county, until August, 1857, when he moved to a farm near there. On the 16th day of that month, a third child was born unto them, whom they named Annie Butler.

Some time later they moved to another farm near-by, where he resided until his death and where he accu-mulated his property. He farmed, engaged in the mer-cantile business and operated a grist and a sawmill.

He and his wife did not live happily together, but there is no suggestion that she was unfaithful to him. He was high tempered, exacting and dictatorial, be-lieving that the wife is the servant of the husband, or at any rate, he acted on the theory that he had the right to inflict corporal punishment upon her whenever he saw fit to do so. In a fit of temper, about the year 1859, he beat her up badly, and drove her from home, she carrying the visible marks of his brutality with her. She was pregnant at the time, and when driven from home, she started afoot to Sturgeon, some miles away, and was found by the wayside in a hazel thicket, about to be confined.

W. T. Mathis and others discovered her, and car-ried her to a new hotel Mathis was building in Stur-geon. He put up a bed for her and placed her upon it, whereat, the first night thereafter, she gave birth to a baby girl, claimed to be the plaintiff in this case. She remained there only three or four days until she could

walk, when she took the child back to the neighborhood of the home from which she had been driven. The exact date of the birth is not stated, except it was "in plum or hazelnut time," which of course was in midsummer or early fall.

Shortly after the separation, Butler sent the three older children back to New York, and he joined the Union army at the outbreak of the war, and served throughout that entire period.

He never returned to Missouri until 1865, when he came back to his old home, near Sturgeon.

During the first two or three years of Butler's absence, his wife and child, according to the testimony of many witnesses, lived with various neighbors near her old home, working when she could, but depending largely upon charity; at one time she lived in the county poor house, and subsequently she went to Columbia, Missouri, and worked there for a while, and in 1862 she returned to Sturgeon, where she worked for John Monihan and others.

In 1863, she and her baby left Sturgeon and went to Mexico, Missouri, some fifteen or twenty miles east. That was the last time they were ever seen in Boone county.

Butler never questioned the legitimacy of the child, but frequently after his return from the war, and after her departure from the country, he spoke of the child and upon several occasions expressed to the neighbors a desire to locate her; but as a rule he was very reticent about his wife and this child.

Annie Butler, a daughter of the deceased, John Butler, knew she had a sister, and some two or three months prior to her marriage she told the witness, W. T. Mathis, in the presence of Laura Hawkins, a neighbor girl, that she had a sister living in Monroe county, near Paris.

The following facts are practically undisputed, viz.:

Mrs. Butler's given name was Jane, and her maiden name was Jane Gorden. At the date of the separation she was about thirty years of age, of rather fair complexion, dark brown hair, blue eyes, dark eye-lashes, medium height and inclined to be fleshy.

Mrs. Butler was at times intemperate, and prior to the separation, she became intoxicated, fell in an open fire and burnt one of her arms very seriously, resulting in a permanent disfigurement.

The child was first called Caledonia by her mother, but prior to leaving Boone county she changed her name and called her Lizzie.

The first thing heard of Mrs. Butler and the child after they left Sturgeon for Mexico, was in the month of October, 1863. One evening in that month, a woman with a child came from the direction of Mexico, on a foraging wagon of a company of Union soldiers bivouacked on the highway leading from Mexico to Paris. Some of those soldiers testified that the child was four or five years old, with dark hair.

They remained in the camp over night, and in the morning Colonel Forbes, commander of the company, turned the child over to Dan Wyman, who was running a hack from Mexico to Paris. The latter departed with the child in the hack, for Paris.

The soldiers subsequently, in November, saw the child in Paris, and still later they saw her there, at the home of Mr. Wetmore. After living with the latter six or seven months, Mr. and Mrs. Wetmore adopted the child and reared and educated her, where she lived as a daughter until she was married.

Shortly after the child arrived at Wyman's, this same woman appeared at Paris, who had a badly burned arm. She said her name was Jane Butler, and that the child was hers, and its name was Lizzie.

Each of them were known in that community by their respective names.

240 Sup.—34

Mrs. Butler stated to various persons in and about Paris that she was the wife of John Butler of Boone county, and that he was the father of the child; also that she had by him three other children living in Boone county.

There was some evidence which also tended to show that the child was the daughter of Jane Gorden, the maiden name of Mrs. Butler.

This woman who claimed to be Mrs. Butler sympathized with the Union cause, and was a Catholic, and objected to Mrs. Wetmore raising the child, because she was not a Catholic, and did not sympathize with the Union cause.

When Mrs. Wetmore refused to give up the child, the mother called upon the Union soldiers for assistance in procuring its custody. This trouble, which assumed an ugly form at first, was however, compromised, and Mrs. Wetmore gave the mother a photograph of the child, and she left Paris, and has never been heard of since, except, in a general way, that she had long since died.

John Butler subsequently remarried, and he and that wife separated, and he again married.

There are some additional detail facts which will be noticed in the opinion.

The court found the issues for the plaintiff, and rendered judgment accordingly.

In due time, and in proper form, some of the defendants appealed to this court.

I.   The sole ground assigned, by counsel for appellants, for a reversal of the judgment is thus stated: "The court comitted error in admitting the testimony of certain witnesses as to the identity of Jane Butler by Jane Butler's own declaration with no other proof, and also as to her relation to John Butler for the same reason."

"The fact of the relationship of the declarant must be established by evidence other than her own declaration before the declaration became admissible," or to put it another way, "Not only is it necessary, in order that the declaration of a person afterwards deceased should be admissible in cases of pedigree, that the declarant should have been related to the family in question or connected with the same by marriage, but this relationship must be established by some proof. other than the declaration itself." Or .further, the rules of evidence governing statements of this kind are:

"1.   The statement must be made *ante litem motam*.

"2.   The declarant must be dead.

"3.   A prior condition to both of these is, that it should be proved by some source of evidence independent of the statement itself, that the person making the statement is related to the family of which she speaks."

In support of that proposition, we are cited to the following authorities: 1 Wharton on Evidence, p. 209; Elliott on Evidence, sec. 380 and 381; Wigmore on Evidence, sec. 1490; 16 Cyc. 1229; Kennedy's Trial Evidence, p. 22; 2 Jones on Evidence, p. 712.

In brief, the position. of counsel for appellant is this: That there is no evidence whatever preserved in this record, which shows or warranted the .trial court in finding that the woman and child who appeared in Paris, in October, 1863, and known as Jane Butler and Lizzie Butler, were the wife and child of John Butler, late of Sturgeon, Boone county, Missouri, or that Jane and Lizzie were their true names, save and except the declarations of the former, to the effect that such were their names, and that they bore those relations to him.

Under the authorities cited, counsel insist that those declarations were inadmissible in evidence for

the reasons previously stated; and that they should be stricken out by this court, the judgment reversed and the bill dismissed, for the reason that when so stricken out, there would remain no sufficient evidence to support the findings of the court.

The clearest and soundest statement of the rule governing the admission of declarations of persons as to pedigree and relationship, is stated in 16 Cyc. 1229, as follows:

"Notwithstanding an early tendency to regard intimate acquaintance with the family as a sufficient basis for knowledge as to facts of pedigree, and so to receive the declarations of family physicians, intimate friends, persons living in the family, or servants and other persons having adequate knowledge of facts of family genealogy or opportunities for acquiring it, the rule is now settled that, both in cases of reputation and of direct statements, the only competent declarants are those related to the family; and that consequently the declarations as to pedigree made by intimate friends, neighbors, or even by persons living in the family, or by servants, however trustworthy or long employed in the family, are incompetent.

"A second condition of relevancy is that the declarant should be disinterested to the extent of having no motive which can fairly be assumed to be such as would induce him to state the fact otherwise than as he understood it. The statement therefore must be shown to have been made *ante litem motam; a fortiori,* before commencement of a suit involving the issue to which the declaration relates. It is not material, however, that a controversy has arisen regarding a cognate matter, unless indeed it clearly foreshadows one on the precise subject-matter of the declaration; that a controversy, since entirely abated, once existed; or that a state of affairs is known to exist out of which a controversy may at any time arise. On the other hand, the declaration is inadmissible if a con-

troversy in fact exists, although the declarant be ignorant of it, or it has not reached the stage of litigation. A declaration made expressly with a view to a probable future contest is admissible *quantum valeat;* but declarations made in the process of collecting evidence to substantiate the claim involved in a subsequent *lis* are incompetent.

"It is universally held that declarations in pedigree cases are not admissible unless the declarant is dead."

Some of the States announce a more liberal rule; for instance the Court of Appeals of California, in the case of In re Clark's Estate, 110 Pac. 828, held that the declarations of the deceased father of claimants to the estate of an intestate that the intestate was his sister, made in the lifetime of the intestate, were admissible without extrinsic preliminary proof of the relationship of the father to the intestate.

This same general principle seems to be supported by the following authorities: 2 Wigmore on Evidence, sec. 1491; In re Hartman's Estate, 107 Pac. (Cal.) 105; Overby v. Johnston, 42 Tex Civ. 438; Fowler v. Simpson, 79 Tex. 614; Sitler v. Gehr, 105 Pa. 577; Smith v. Smith, 140 Wis. 599; Hubatka v. Meyerhofer, 79 N. J. L. 264; Mann v. Cavanaugh, 110 Ky. 776.

In our opinion, the former rule is the wiser and more sound of the two, for the reason that if the preliminary proof of relationship is not required, great injustice might be done, or a gross fraud perpetrated by a designing person, by simply declaring that he or some member of his family was related to a deceased person, who has no opportunity to contradict the statement, or disprove the fact.

It should be borne in mind, that such evidence is purely hearsay, unsanctioned by any form of oath, therefore no punishment could be inflicted upon the declarant, while living, for his prevarication, nor successfully combated in many cases after death. For

this reason it seems to us, that a reasonable weight of preliminary proof of relationship should be required before receiving the declarations of such witnesses. In other words, all reasonable precautions should be used to protect the fountain source of such evidence, which at best is very unsatisfactory, from fraud and pollution. The degree of such proof must of necessity depend largely upon the *facts and circumstances of each particular case,* and no hard-and-fast or unbending iron rule can be laid down and enforced alike in all cases.

The following cases will somewhat illustrate the degree of such proof that is required in a case: Fulkerson v. Holmes, 117 U. S. 389, l. c. 397; Vowles v. Young, 13 Ves. 147; Monkton v. Attorney-General, 2 Russ. & M. 157; Young v. Schullenberg, 165 N. Y. 385; In re Bobb's Estate, 37 S. C. 19; Brown v. Lazarus, 5 Tex. Civ. 81; Fowler v. Simpson, supra; Louder v. Schluter, 78 Tex. 105, 22 Am. and Eng. Ency. Law (2 Ed.), 644 and cases cited; Layton v. Kraft, 98 N. Y. S. 72.

So considering this case under the rule of the law thus enunciated, were the declarations of Mrs. Jane Butler, regarding the relationship she and Lizzie Butler, the respondent in this case, bore to John Butler of Sturgeon, Missouri, admissible in evidence?

In our opinion, that question should be answered in the affirmative, for the reason that in our judgment this record abounds with such preliminary proof, and is ample to satisfy even a more stringent rule than that announced by the authorities before mentioned.

Briefly stated, the proof is as follows (for convenience, we will use the name "Paris Butler" when referring to the Jane Butler who appeared in Paris with the child Lizzie in the fall of 1863):

Independent of the means by which the fact was brought about, Paris Butler was known for a year or more, up to her death, in and about Paris, as Jane

Butler, presumably from her declarations; that was also the name of the wife of John Butler, who disappeared in 1863.

The latter was about thirty years of age when she was driven from her home, and the former, according to the opinion of the witnesses, appeared to be about thirty-five when she appeared in Paris in the fall of 1863. Both had blue eyes, dark eyebrows, and dark hair. Jane Butler had rather a fair complexion, while Paris Butler was of rather a dark complexion (this, however, might be accounted for as suggested by counsel for respondent, by the fact that she was five or six years older, at the latter date, and may have been tanned by exposure during her wanderings).

Each of them were about the same height and weight, and both "chubby," Paris Butler being probably a little heavier. Both were nervous, excitable, and of a roving disposition—more marked in Paris. Both were sad and somber in disposition. Each was poor, and had to toil with her hands for a living.

Jane Butler was at times addicted to drink. The record, as to Paris, in that regard is silent.

Both were Catholics and sympathized with the Union cause; this appears more from the conduct of Paris than from her words.

Jane Butler was the mother of four children, the youngest a girl named Lizzie, born in the fall of 1859, and had dark hair.

The last time Jane Butler and Lizzie, her daughter, were ever seen on this earth, so far as the evidence shows, was when they left Sturgeon for Mexico, in the year of 1863; and the first time Paris Butler and Lizzie, her daughter, were ever seen or heard of, on this earth, was when they mounted the foraging wagon of the Union soldiers, a few miles from Mexico, and rode thereon to the camp near Paris. The exact period which expired between the time the former departed for Mexico and the time when the latter appeared at

the camp, is not disclosed by the evidence, but it could not have exceeded a few months.

The latter child was four or five years of age when first seen at the camp, in October, 1863. Her hair was dark and here eyes were blue.

Both women had a badly burnt arm, amounting to a disfigurement.

The husband of Jane Butler was a Catholic, and served in the Union army. The *conduct* of Paris Butler, emphasizing her words in her appeal to the soldiers for aid in recovering the custody of her child, tends to show that her husband was also a Union soldier and a Catholic in religion.

John Butler, the husband of Jane Butler, and father of Lizzie Butler, knew that the two latter had disappeared from Boone county, and upon several occasions expressed a desire to find the latter. And Annie Butler, the daughter of Jane and John Butler, and sister of Lizzie Butler, knew that the two latter had disappeared, and she told Mr. Mathis and others that her sister Lizzie lived in Monroe county, near Paris.

When we further consider the fact that Boone, Audrain and Monroe counties all adjoin each other, and were connected by railroads, with a somewhat sparce population, and where all must have had more or less acquaintance with each other, it seems to me as almost inconceivable that Jane Butler and her daughter Lizzie could all at once disappear from the face of the earth, while going from Sturgeon to Mexico; and that almost immediately thereafter, her daughter Lizzie could, unknown to the whole world, spring into existence a few miles north of Mexico, and both go to Paris, the former remaining there about a year, and the latter until she reached womanhood, without exciting a word of comment, or calling forth an investigation of any kind, except upon the reasonable theory that Jane Butler and her daughter Lizzie of Sturgeon, were none

other than Jane Butler, whom we have been calling "Paris Butler," and her daughter Lizzie.

Even in the absence of the declarations of Paris Butler, as to the relationship she and her daughter bore to the deceased, John Butler, the evidence disclosed by this record is ample to establish the fact that Jane and Lizzie Butler of Sturgeon were the same persons as Jane and Lizzie Butler of Paris. And when we corroborate that evidence with the declarations of Paris Butler, then their identity is established almost beyond a reasonable doubt. No four persons could have so many qualities in common with each other.

Moreover, the same names, and ages, pedigrees and family history point with an unerring finger to the fact that they are the same persons.

In our opinion the evidence was ample to support the findings and judgment of the court.

We, therefore, affirm the judgment. All concur.